<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

SHAWN LOGAN,

        Plaintiff,

    v.

MILLSTONE MANOR LLC *et al.*,

        Defendants.

Civil Action No. 20-14433 (MAS) (TJB)

**MEMORANDUM OPINION**

<u>**SHIPP, District Judge**</u>

This matter comes before the Court on Defendants Millstone Manor, Jamesburg Manor LLC, and Visions 2013 LLC's (collectively, "Millstone") Motion for Partial Summary Judgment. (ECF No. 12.) Plaintiff Shawn Logan ("Logan") opposed, and Millstone replied. (ECF Nos. 15, 16.) The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants Millstone's Motion.

**I.    BACKGROUND**[1]

    **A.    Logan's Employment at Millstone**

Logan joined Millstone Manor as a head cook in April 2018. (Pl.'s Counterstatement of Undisputed Material Facts ("CSUMF") ¶ 1, ECF No. 15; Logan Dep. Tr. 48:10-13, ECF No.

---

[1] On a summary judgment motion, the Court will "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

12-6.) Millstone is a residential healthcare facility that provides shelter and aid for the homeless and individuals suffering from mental health impairments. (Defs.' Statement of Undisputed Facts ("SUMF") ¶ 1, ECF No. 12-2.)[2] On beginning his employment at Millstone, Logan received an apartment on the premises at a fixed rate of about $300 a month as part of his compensation. (Logan Dep. Tr. 171:9-18, 172:11-16.) His day-to-day job responsibilities included preparing and cooking meals for Millstone's residents. (SUMF ¶ 15.)

The sole owner of Millstone, Arlene Isidro ("Isidro") launched the business in 2015, employing about five to seven individuals at any given time. (Isidro Dep. Tr. 18:19-24, ECF No. 12-7; SUMF ¶ 5.) Isidro simultaneously operated a sister business that provided similar services, Jamesburg Manor LLC ("Jamesburg"), based in Monroe, New Jersey. (SUMF ¶¶ 3-4.) Although Logan mostly worked at Millstone, in light of the overlapping owner, he occasionally filled in as a cook at Jamesburg. (Logan Dep. Tr. 77:23-25, 78:1-3.)

In April 2020, a few years after Logan started working at Millstone, Mina Matos ("Matos") was hired as the Chief Operating Officer at the company.[3] (CSUMF ¶ 2.) She oversaw daily operations and, in her supervisory role, had the authority to schedule, discipline, and terminate employees at Millstone. (SUMF ¶¶ 7-9.) Matos was responsible for supervising Logan in his role as head cook. (SUMF ¶ 9.) Two months after Matos was hired, Logan alleges that she began making comments that made him uncomfortable. (Logan Dep. Tr. 145:10-13.) Specifically, he

---

[2] Considering this matter comes before the Court on Millstone's motion for partial summary judgment, it relies only on Millstone's statement of material facts that Logan agrees with. (*Compare* Pl.'s SUMF, *with* Pl.'s Response to Def.'s Statement of Undisputed Material Facts ("Pl.'s Response to Material Facts"), ECF No. 15.)

[3] Based on the record, Matos's first name is Elmilda but she goes by "Mina." (Mina Matos Dep. Tr. 11:22-25, 23:1-3, ECF No. 12-8.)

claims that while at Millstone she started a pattern of sexually harassing him while he was on the clock. (CSUMF ¶¶ 5-6.) There are three interactions at issue.[4]

*First*, in June 2020, Matos walked into the kitchen while Logan was working and struck up a conversation with his coworker, Jennifer Wheeler ("Wheeler"). (Logan Dep. Tr. 146:6-24.) Wheeler was a dishwasher and housekeeper at Millstone. (*Id.* at 146:9-12, 191:6-8.) According to Logan, Matos was conversing with Wheeler when she suddenly glanced at Logan and said, "Oh, I like tall, black men." (*Id.* at 146:9-12; CSUMF ¶ 7.) Logan could not remember the rest of the conversation between Matos and Wheeler because he was "too busy" with "too [many] things to do" and "not really paying attention." (Logan Dep. Tr. 147:4-7.) Logan felt uncomfortable after the comment but did not say anything to anyone in that moment or afterwards. (*Id.* at 147:8-23, 149:15-25; CSUMF ¶ 7.) A short while later, Matos and Wheeler's conversation ended unremarkably. (Logan Dep. Tr. 146:18-24.)

*Second*, a few days later, Logan was again working in the kitchen alongside Wheeler, who was washing the dishes. (*Id.* at 149:1-14.) Matos struck up a conversation with them both and said, "Oh, I'm just trying to get my body back ready for the beach." (*Id.*) At this point, Matos "dropped down and . . . grabbed her ankle." (*Id.*; *see also* CSUMF ¶ 8.) Logan stepped back abruptly, feeling uncomfortable. (Logan Dep. Tr. 149:7-11.) Nothing else noteworthy occurred during that conversation.

*Third*, Logan recalled that on two undated occasions, while he was showing Matos the kitchen's cleanliness and organization, they were in the refrigerator reviewing the food items when Matos stood "too close" to Logan. (*Id.* at 150:19-25, 151:1-25; CUMF ¶ 9.) During at least one of

---

[4] Notwithstanding Matos's denial of Logan's accusations, at the summary judgment stage the Court does not weigh the parties' credibility. (*See* Mina Matos Dep. Tr. 40:14-25, 41:1-6.)

3

these occurrences, Wheeler was nearby working in the kitchen at the time. (Logan Dep. Tr. 152:8-21, 153:1-6.) During both instances, Logan felt uncomfortable and backed away. (*Id.* at 151:24-25; CUMF ¶ 9.) Matos did not say or do anything else during these encounters.

According to Logan, Matos never asked him out on a date, propositioned him or made sexual demands, touched him, or commented on his appearance. (Logan Dep. Tr. 148:5-21, 150:1-16.) Nor did Logan ever inform Matos that he felt uncomfortable during these three incidents. (*Id.* at 153:16-24.) Likewise, Logan did not inform Isidro or any other member of management that he felt harassed. (*See Id.* at 162:1-2 ("Because I didn't really, really get to talk to her about what was really going on.").) At weekly meetings between Millstone employees, however, Logan wanted to speak with Isidro about Matos, but Matos spoke over him every time he tried to speak. (*See id.* at 156:3-25.) At some point between June and July 2020, Logan sent a text message to Isidro stating that he was having "issues" with Matos.[5] (*Id.* at 168:7-25, 169:1-3.) Isidro replied that Logan should "give [Matos] a chance." (*Id.* at 168:18-20, 169:4-6) Overall, Logan never informed Isidro that he felt harassed. (*Id.* at 162:1-2.)

### B. Logan's Trip to Atlantic City

On July 3, 2020, Logan took time off work and went on a vacation to Atlantic City with his fiancée. (*Id.* at 194:2-12, 196:15-16.) While there, Logan gambled and won several hundred dollars. (*Id.* at 197:7-10.) He was due back at work on the following Tuesday, July 7. (*Id.* at 208:23-25, 209:1.) But on the day before he was set to return, Logan texted Matos that he won some money and would be returning to work a day later, on Wednesday, July 8. (*Id.* at 200:8-25,

---

[5] Discovery of Logan and Isidro's text messages during the relevant time frame do not reflect this message was ever sent. But in construing all facts and evidence in a light most favorable to the nonmoving party, the Court accepts Logan's testimony that he made a comment about having "issues" with Matos at some point to Isidro. (*E.g.*, Logan Dep. Tr. 168:17-18, 160:1-6.)

4

201:1-2.) The relevant part of the conversation, beginning on Monday, July 6, progressed as follows:

> **Logan**: Hey this is Shawn[.] I win so[me] money[.] Come back Wednesday . . . keep [yo]u up to date.
> **Matos**: Please come back when you were due back. No coverage.
> **Logan**: Got my winning. Jen [is] there.
> **Matos**: That's [w]onderful, congratulations. You['re] due back tomorrow. See you tomorrow. Jen works nights now.
> **Logan**: Not going [to] make it.
> **Matos**: I think it's in your own interest to make sure you make it.
> **Logan**: I don't think so [yo]u threat[en] me.
> **Matos**: See [you] tomorrow.
> **Logan**: [You] have been [n]otified.
> **Matos**: Again, it's in your best interest to come back to work when you said you would be back.
> **Logan**: [You] blow my weekend [yo]u say what [yo]u say I say what I say stop text[ing] me.
> **Matos**: Excuse me, what are you trying to say?
> \*\*\*
> [*Tuesday, July 7, 2020*]
> **Matos**: Please report to the office tomorrow. I'll be in at 9:00 a.m.

(Def.'s Moving Br., Ex. L, ECF No. 12-18.) Logan recalled having a telephone conversation with Matos prior to their text message exchange where he informed her that he also had a flat tire. (Logan Dep. Tr. 199:11-19.) Logan did not change the tire until Tuesday, the next day, because he "wasn't ready to deal with it at the time." (Logan Dep. Tr. 199:20-25, 200:1-7.) At some point during their texting conversation on Monday, Logan blocked Matos's number and, as a result, was delayed in receiving her messages. (*Id.* at 208:7-20.)

### C. Logan's Termination

During the same time frame as the two-day text message interchange, Logan checked out of his hotel in Atlantic City on Monday (*id.* at 210:13-15), changed his tire (*id.* at 211:13-17), dropped his fiancée off at her home in Newark (*id.* at 211:18-21), and drove back to his apartment (*id.* at 213:2-25, 214:9-10). Logan recalls returning home to a note on his door that he was

5

terminated from Millstone.[6] (*Id.* at 215:11-16.) The note, authored by Matos, premised his termination on his insubordination in the text message chain and failing to report for work. Effective July 7, 2020, the disciplinary action form read as follows:

> [Logan], on 7/6/20 you text[ed] me to tell me and I quote "got my winnings." You also said you would be back on Wednesday. I asked you to please come back when you were due back. You said Jen's there. I informed you that Jen was now working nights and that it would be in your best interest to come back tomorrow. You said you couldn't make it. You also said again I quote "[yo]u have been notified." This is a blatant act of insubordination. For this reason and for not showing up to work, you have been terminated. You also did not come to the office on Wednesday when I asked you to. You are not allowed on these premises as of today 7/8/20. Please vacate within 3 days.

(Def.'s Moving Br., Ex. O ("Termination Letter"), ECF No. 12-21.)

Not wanting to interact with Matos, Logan kept her number blocked and waited a day or so. (Logan Dep. Tr. 215:20-25, 216:1-3.) By Wednesday, he unblocked Matos's number and had the following exchange (verbatim):

> **Matos**: Good morning, please come to the office.
> **Logan**: I'm [sic] be here and I got to take me to court I no [sic] this trust waste [yo]ur time if [yo]u want. I'm [sic] be here trust me if [yo]u want to get sue[d,] please fuck with me.

(Def.'s Moving Br., Ex. L; Logan Dep. Tr. 216:11-25, 217:1-2.) After Wednesday, Logan did not speak with Matos directly and instead spoke with Isidro. (Logan Dep. Tr. 218:2-25, 219:6-9.) Logan sought out Isidro to discuss his termination; however, she informed him that because Matos fired him, Logan needed to speak with Matos about his future at Millstone. (*Id.* at 219:6-9.)

---

[6] The termination letter is dated as of July 8, 2020, effective as of July 7, 2020, and reflects a July 6, 2020, date of incident.

### D. Procedural Background

Logan sued Millstone in the Superior Court of New Jersey in October 2020. Logan brought five claims: (1) sexual harassment under the New Jersey Law Against Discrimination ("NJLAD"), (2) quid pro quo sexual harassment under NJLAD, (3) discriminatory and retaliatory discharge under NJLAD, (4) Fair Labor Standards Act violation, and (5) New Jersey Wage and Hour Law violation. (Compl., ECF No. 1-1.) Millstone removed the action to federal court. (ECF No. 1.) Over the following months, extensive discovery took place with depositions of Logan, Matos, Isidro, and others. After the completion of discovery, Millstone moved for partial summary judgment on Counts One, Two, and Three premised in NJLAD (ECF No. 12); Logan opposed (ECF No. 15); and Millstone replied (ECF No. 16).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . ., there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

### III.   DISCUSSION

Millstone moves for partial summary judgment on three of Logan's claims: (1) sexual harassment hostile work environment, (2) quid pro quo sexual harassment, and (3) discriminatory and retaliatory discharge. Specifically, as to sexual harassment, there are generally two types: "(i) quid pro quo sexual harassment, which occurs when an employer conditions certain things on sexual demands; and (ii) hostile work environment sexual harassment, which 'occurs when an

employer or fellow employees harass an employee because of his . . . sex to the point at which the working environment becomes hostile.'" *Thompson v. S. Amboy Comprehensive Treatment Ctr.*, No. 18-9923, 2021 WL 3828833, at *5 (D.N.J. Aug. 27, 2021) (quoting *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993)). NJLAD provides in relevant part as follows:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a. For an employer, because of the race . . . sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

N.J. Stat. Ann. § 10:5-12 (West 2021). In the years that followed the statute's enactment, Title VII of the Civil Rights Act of 1964 became the guiding principle "as 'a key source of interpretive authority.'" *Lehmann*, 626 A.2d at 452 (citing *Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 906 (N.J. 1990) and 42 U.S.C.A. § 2000e *et. seq.*)

The Court addresses each of Logan's three NJLAD claims in turn.

### A. Logan Fails to Make Out a Prima Facie Case of Sexual Harassment.

Logan first raises a hostile work environment claim based on sexual harassment. To make an adequate showing under this claim, a plaintiff must prove at trial that the "complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a (3) *reasonable* [person] believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive*." *Cutler v. Dorn*, 955 A.2d 917, 924 (N.J. 2008) (citing *Lehmann*, 626 A.2d at 453). Although parsed out as different elements, by nature the inquiry is interdependent. *Lehmann*, 626 A.2d at 453. The standard does not delineate based on the plaintiff's sex, either. *Id.* at 454.

9

At trial, plaintiff must prove by a preponderance of the evidence that he "suffered discrimination because of [his] sex." *Id.* Equally clear, the plaintiff "need not be the target of harassing conduct" to sufficiently raise a claim of hostile work environment. *Cruz v. Trane Inc.*, No. 19-07324, 2022 WL 1442158, at *4 (D.N.J. May 5, 2022). Additionally, a plaintiff must show that the conduct satisfies the "severe or pervasive" requirement, and courts focus on the "*harassing conduct*" rather than the "effect on the plaintiff or on the work environment," invoking a "reasonable person standard." *Cutler*, 955 A.2d at 924 (citing *Lehman*, 626 A.2d at 455). To that effect, in applying the "severe or pervasive" standard, courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Wilson v. New Jersey*, No. 16-7915, 2019 WL 5485395, at *9 (D.N.J. Oct. 25, 2019). Whether a plaintiff presents the "extreme case" where a single incident is of such severity that a reasonable person would perceive the workplace as hostile or "numerous incidents that . . . considered together are sufficiently pervasive," the conduct must rise to a level of "alter[ing] the conditions of the victim's employment and creat[ing] an abusive working environment." *Lehmann*, 626 A.2d at 455-56 (citing, among other cases, *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir. 1991)).

Viewing the evidence in a light most favorable to Logan, his claim of hostile work environment falls woefully short of meeting the requisite severe or pervasive standard. *First*, as to Matos's initial offending comment that she likes "tall, black men," this statement was made in the context of a conversation between Matos and Wheeler in the kitchen during which Logan was "not really paying attention" because he was "too busy" working. (Logan Dep. Tr. 146:7-24, 147:4-19 (describing that Matos made the comment while "engag[ed] in a conversation with [Wheeler]").)

The only fact Logan presents that even remotely ties the comment to his presence is that Matos "looked up at [him]" while she said it. (*Id.* at 146:13-14.) Although he recalls feeling uncomfortable after the comment, the Court must look to the "harasser's conduct, not the plaintiff's injury," in assessing severity. *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 622 (N.J. 2013) (quoting *Lehmann*, 626 A.2d at 456). Ill-advised at worst, Matos's comment does not rise to the level where a reasonable person would expect it to "amount to a change in the terms and conditions of employment." *El-Sioufi v. St. Peter's Univ. Hosp.*, 887 A.2d 1170, 1190 (N.J. Sup. Ct. App. Div. 2005) (citation omitted). Nor, as the first allegation raised, is it the rare case "in which a single statement has sufficed for purposes of creating a triable question about hostile work environment" that has "uniformly involved an outrageous and offensive statement made by a supervisor directly to the complaining subordinate." *Id.* Clearly, it is not. *Id.* ("Such a factual scenario is highly unusual.")

*Second*, in wading through the timeline, the Court examines the allegation that a few days later, Matos told Wheeler and Logan during a conversation that she needed to get her "body back ready for the beach," during which she bent over and touched her ankles in a display of calisthenics. (Logan Dep. Tr. 149:7-11.) Notwithstanding that Logan felt "really . . . uncomfortable" by this incident (*id.*), the Court again must turn to the "reasonable" person community standards to ascertain whether the conduct was harassing. *Lehmann*, 626 A.2d at 458 ("A hypersensitive employee might have an idiosyncratic response to conduct that is not, objectively viewed, harassing."). In doing so, the Court finds that the conduct is not severe enough that a reasonable employee would believe the working environment turned hostile. *See Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 133 (3d Cir. 2011) ("[N]ot every sexual comment, action or joke creates a hostile work environment."). Nor as a second incident occurring

11

within a few days is it considered "pervasive." *Cf.*, *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425, 453 (D.N.J. 2009) (finding "a significant number of incidents occurring over the course of four years" to be pervasive).

*Third*, Logan describes that on two separate occasions while he was walking Matos through the inventory and cleanliness of the Millstone kitchen, Matos stood "so close" to him as to make him feel uncomfortable. (Logan Dep. Tr. 150:22-25.) Wheeler was present on at least one occasion. (*Id.* at 152:14-24, 153:1-6.) Matos did not touch Logan or say anything noteworthy during the alleged personal space invasions. (*See* Logan Dep. Tr. 150:21-25, 151:12-25, 153:4-24.) She simply stood close to him while they were inspecting the kitchen and freezer. (*Id.*) Again, this conduct is insufficient, alone or in combination with the first two allegations, to constitute conduct so severe or pervasive as to change Logan's workplace into an offensive or abusive environment. *See Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) ("[T]he standard for establishing a hostile work environment is high.").

Undoubtedly, what matters is not any one incident in a vacuum but the "cumulative effect" of all alleged incidents as, "[i]n most cases, it is the cumulative impact of successive incidents from which springs a fully formed hostile work environment." *Paige v. Atrion Commc'n Res., Inc.*, No. 17-00472, 2019 WL 5846799, at *6 (D.N.J. Nov. 7, 2019) (quoting *Godfrey v. Princeton Theological Seminary*, 952 A.2d 1034, 1045 (N.J. 2008)). Still, in reviewing all allegations, facts, and circumstances holistically, the Court finds that "no reasonable jury could conclude that the alleged conduct was 'severe or pervasive'" as to "render [Logan's] work environment hostile." *Clayton v. City of Atlantic City*, 538 F. App'x 124, 128-29 (3d Cir. 2013). *Cf.*, *Paige*, 2019 WL 5846799, at *8 (denying summary judgment where plaintiff alleged at least fourteen separate incidents in which her supervisor sexually harassed her). The three minor incidents over a two

12

months' span do not constitute a hostile work environment. *Cf. Bacone v. Phila. Hous. Auth.*, 112 F. App'x 127, 129 (3d Cir. 2004) ("The behavior at issue involved no more than four incidents during the span of two weeks, and though they were offensive, they are not pervasive enough to rise to the level of a Title VII violation."). "Unfortunately for [Logan], as a matter of law, the facts of this case, even when considered in the light most favorable to [him], do not meet that high bar" set in hostile work environment cases. *Henderson v. United Parcel Serv.*, No. 17-13059, 2020 WL 1983481, at *8 (D.N.J. Apr. 27, 2020) (granting summary judgment against plaintiff's sexual discrimination hostile work environment claim where five separate incidents were alleged).

      **B.**    **Logan Fails to Make Out A *Prima Facie* Case of Quid Pro Quo Sexual Harassment.**

In count two, Logan alleges a claim of quid pro quo sexual harassment predicated on the same three incidents discussed above. Again, his claim fails as a matter of law.

At bottom, "[q]uid pro quo sexual harassment occurs when an employer attempts to make an employee's submission to sexual demands a condition of his or her employment" and "involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences." *Lehmann*, 626 A.2d at 452. In other words, under NJLAD or Title VII,

> [U]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute [quid pro quo] sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

*Moss v. Ret. Value, LLC*, No. 12-157, 2013 WL 5816657, at *10 (D.N.J. Oct. 29, 2013) (alteration in original) (quoting *Bonenberger v. Plymouth TP.*, 132 F.3d 20, 27 (3rd Cir. 1997). Termination

13

may be the basis for a quid pro quo harassment claim if "there is evidence that the termination was connected to rejection of a sexual advance." *Id.* at *11 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)).

Logan needs to make the requisite showing that there was "an implicit or explicit threat that if [Logan] d[id] not accede to the sexual demands, he" would receive adverse treatment such as termination. *Shock v. E.I. Du Pont De Nemours & Co.*, No. 16-3410, 2017 WL 3122656, at *3 (D.N.J. July 21, 2017) (quoting *Lehman*, 626 A.2d at 452). Although Logan pleads in conclusory fashion that "[a] determinative [or] motivating factor in [his] discharge was the fact that he did not accede or agree with *quid pro quo* sexual harassment that had been directed at him by" Matos, he provided *no* evidence in support. (Compl. ¶ 42.) Logan conceded he was never explicitly propositioned by Matos for any type of romantic engagement. (Logan Dep. Tr. 148:16-21, 150:5-16, 154:2-13; *see also Sparks v. Reg'l Med. Ctr. Bd.*, 792 F. Supp. 735, 745 (N.D. Ala. 1992) ("The evidence clearly establishes that [supervisor] never demanded sexual favors from plaintiff as a quid pro quo for job benefits nor made submission to sexual conduct a term or condition of plaintiff's employment.").)

Thus, Logan is left with proving a theory that, implicitly, Matos propositioned him and, because of denying her, he lost his job. *Lehmann*, 626 A.2d at 452. This, too, lacks an iota of evidence. *See Newsome v. Admin. Off. of Cts. of State of New Jersey*, 103 F. Supp. 2d 807, 817 (D.N.J. 2000) ("[Plaintiff] also alleges that she faced quid pro quo harassment. The record is utterly devoid of evidence to support this claim . . . [because plaintiff] has put forth nothing to suggest that any job benefits or conditions were contingent—explicitly or implicitly—on her acceding to [supervisor's] advances."). For example, Logan does not allege that Matos ever asked him for sexual favors, touched him at any time, asked him on a date, spoke to him directly about anything

14

sexual in nature, or in any way indicated that she was interested in Logan romantically. (*See, e.g.*, Logan Dep. Tr. 154:7-9.) Nothing in the record suggests that Logan accepted, rejected, or even acknowledged Matos's allegedly implicit advances. *Stefanoni v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 65 F. App'x 783, 787 (3d Cir. 2003) ("[Plaintiff] does not allege that she acquiesced in the sheriff's alleged sexual conduct or that she rejected the sheriff's sexual advances. Therefore, her claim for *quid pro quo* harassment lacks merit and does not raise a triable issue of fact.").

Rather, the record unambiguously demonstrates that Logan was terminated weeks after the last incident of alleged harassment, when, in the wake of his Atlantic City trip, he failed to show up for work and sent Matos a series of belligerent text messages. (Def.'s Moving Br., Ex. L ("Not going [to] make it."; "I don't think so [yo]u threat[en] me."; "[You] have been notified."; "[You] blow my weekend [yo]u say what [yo]u say I say what I say stop text me.").) The Court is hard-pressed to find evidence of anything remotely resembling a nexus between Logan's cited incidents of harassment and his termination. *McCormick v. Pac. Bells, Inc.*, No. 08-5361, 2009 WL 1919225, at *4 (W.D. Wash. July 1, 2009) ("[In] attempting to determine whether implicit quid pro quo harassment has occurred, the key is often the verbal nexus. . . . The tighter the nexus between a discussion about [termination] and a request for sexual favors, the more likely that there has been an 'implicit' conditioning by the harasser."). Even more dubious is the belief that any reasonable trier of fact could infer Matos attempted to proposition Logan from the pointed-to events. *Cf. Rivera Abella v. P.R. Tel. Co.*, 470 F. Supp. 2d 86, 108 (D.P.R. 2007) ("[A]part from the conclusory nature of the allegations, there is no indication of any kind of request for sexual favors . . . nor that any rejection on plaintiff's part affected a tangible aspect of her employment."); *Toth v. Cal. Univ. of Pa.*, 844 F. Supp. 2d 611, 629 (W.D. Pa. 2012) ("[Plaintiff] insinuates that

[defendant's] 'romantic affair with another female subordinate' constitutes evidence that [defendant's] meeting invitations were designed . . . to initiate a sexual encounter [with plaintiff]. That line of reasoning, however, requires a long chain of unwarranted inferences."). In any event, this claim fails as a matter of law.

      **C.**      **Logan Fails to Make Out A *Prima Facie* Case of Retaliation.**

In Count Three, Logan raises a claim of retaliation under NJLAD for allegedly reporting Matos's conduct.

In setting forth a *prima facie* case of retaliation, a plaintiff must show (1) that he engaged in "protected employee activity" known to the employer; (2) "adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Tinio v. Saint Joseph Reg'l Med. Ctr.*, 645 F. App'x 173, 176 (3d Cir. 2016) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)); *see also Battaglia*, 70 A.3d at 619 (substantially same standard for NJLAD retaliation claims). Under the NJLAD, retaliation claims are analyzed following the "well-established burden shifting framework of *McDonnell Douglas*." *Puchakjian v. Township of Winslow*, 804 F. Supp. 2d 288, 304 (D.N.J. 2011). Before the burden shifts to an employer-defendant to establish a legitimate reason for the adverse action, the employee must first make out a *prima facie* case.

Logan fails at step one. "Despite [Logan's] arguments that [he] has shown material facts disputing [Millstone's] positions, the Court finds that there are no genuine [disputes] of material fact as to [Logan's] retaliation claim." *Deresky v. B.J. McGlone & Co.*, No. 14-1930, 2018 WL 3425731, at *11 (D.N.J. July 16, 2018). As an initial matter, the Court already rejected Logan's theory that Matos retaliated against him through terminating his employment after he did not accept her alleged implicit advances. What is left is Logan's testimony that (1) he was "blocked"

16

from informing Isidro that Matos was harassing him and (2) he sent Isidro a text message that he had "issues" with Matos. (CSUMF ¶ 10; Logan Dep. Tr. 158:15-18.) Both theories fall flat.

Starting with the second, there is no evidence that Logan reported to Isidro (or Matos, for that matter) that he felt uncomfortable, harassed, or targeted. (*See* Logan Dep. Tr. 162:1-2.) Instead, the bedrock of Logan's claim is that he sent a single text message to Isidro vaguely reporting "issues" with Matos.[7] (*Id.* at 158:15-18.) But such a general grievance fails to constitute protected activity as a matter of law. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) ("A general complaint of unfair treatment does not translate into a charge of illegal [sex] discrimination."). And Logan concedes that he never said anything about the alleged sexual harassment in any capacity. (Logan Dep. Tr. 159:15-17.) "The central element of a [retaliation] claim under the [NJ]LAD is that the plaintiff 'be engaged in a protected activity, which is known by the alleged retaliator.'" *Mancuso v. City of Atlantic City*, 193 F. Supp. 2d 789, 810 (D.N.J. 2002) (first alteration in original) (*quoting Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 803 (N.J. 1990)). Thus, because Logan never complained of or reported the harassment to Matos or Isidro, he cannot establish the first element.

To be sure, Logan's theory that he was "blocked" from reporting Matos's comments also fails, as his conclusion is unfounded and incredible. *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010) ("On summary judgment, the non-moving party . . . is entitled to have the court credit his version of events, but with qualifications: incredible assertions by that party need not be accepted . . . nor must conclusory allegations." (internal citation omitted)). For one, Logan had Isidro's direct number and testified to texting her about Matos previously. (Logan Dep. Tr.

---

[7] The Court notes that Logan never produced a text message of him telling Isidro that he had "issues" with Matos in discovery. (*See* Def.'s Moving Br., Ex. K.) In any event, the Court will still draw all inferences in favor of Logan.

17

157:17-22, 158:15-18 (noting that Isidro and Logan "used to text back and forth" and he informed her of "issues" with Matos).) But inexplicably, Logan contends that he "attempted to" report Matos to Isidro "several times" during company meetings but could not because Matos talked over him. (*Id.* at 156:3-22.) Without more, the record provides no support that Isidro was aware Logan reported (or attempted to report) sexual harassment. Nor is there any evidence, direct or circumstantial, that Matos knew Logan was trying to report her.

Thus, the Court finds that Logan's retaliation claim fails.[8]

## IV. CONCLUSION

Considering all facts in a light most favorable to Logan, the Court concludes that his claims for hostile work environment, quid pro quo sexual harassment, and retaliation fail as a matter of law. The Court accordingly grants Millstone's Motion for Partial Summary Judgment. An Order consistent with this Memorandum Opinion will follow.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[8] Because Logan never made a protected complaint to begin with, the Court need not reach whether there was a causal connection between the protected activity and his termination. But even if the Court did find Logan's "issues" text message to be sufficient, he provided no evidence that his termination weeks later was related to this reporting.